# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SAGEBRUSH HEALTH SERVICES,

        Plaintiff,

v.

ROBERT F. KENNEDY, JR., Secretary of
Health and Human Services, *et al*.,

        Defendants.

**Civil Action No.** 1:25-cv-00915-JEB

## PLAINTIFF'S COMBINED REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

II.   ARGUMENT ......................................................................................................... 2

   A.  The Statute Congress Enacted Forecloses Mid-Year Eligibility Removals Absent Procedural Safeguards and Substantive Findings. ................................................. 2

        1.  Annual Certification Is the Rule; Mid-Year Removal Is the Narrow Exception. ................................................................................................. 2

        2.  HRSA's Interpretation Would Collapse the Statutory Framework. .......... 3

   B.  HRSA Cannot Bootstrap "Verification" Or "Inherent" Authority Into New Removal Powers. ..................................................................................................................... 4

   C.  The Administrative Record Confirms Statutory Eligibility And HRSA's Contemporaneous Knowledge. ........................................................................................................... 6

        1.  Undisputed Record Facts ........................................................................... 7

        2.  The Record Establishes Eligibility and HRSA's Knowledge. ................... 8

        3.  HRSA Did Not Reconcile Its Decision with the Record. .......................... 8

   D.  HRSA's Decision-Making Was Arbitrary And Capricious. .................................. 9

        1.  HRSA Ignored the Full Record and Obvious Alternatives. .................... 10

        2.  HRSA Treated Similarly Situated Sites Inconsistently. .......................... 11

        3.  HRSA Departed from the Statutory Enforcement Framework Without Explanation. ........................................................................................... 11

        4.  HRSA Failed to Account for Reliance Interests and Foreseeable Consequences. .......................................................................................... 12

   E.  HRSA Imposed A New Binding Documentation Requirement Without Notice And Comment. ........................................................................................................... 13

   F.  HRSA's Repayment Directives Are Final Agency Action And Unlawful. ....... 15

   G.  The Proper Remedy Is Vacatur, Reinstatement, and Injunctive Relief. ............ 17

III.  CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................18

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ......................................................18, 19

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ...........................................................16

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................................15, 16

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
  403 F.3d 771 (D.C. Cir. 2005) .........................................................10, 11

*Eli Lilly & Co. v. Cochran*,
  526 F. Supp. 3d 393 (S.D. Ind. 2021) ...................................................19

*Eli Lilly & Co. v. U.S. Dep't of Health & Hum. Servs.*,
  No. 21-cv-00081, 2021 WL 5039566 (S.D. Ind. Oct. 29, 2021), *appeal filed
  sub nom. Eli Lilly & Co. v. Becerra,* No. 21-3128 (7th Cir. Nov. 15, 2021) *and
  appeal filed sub nom. Eli Lilly & Co. v. Health & Hum. Servs.*, No. 21-3405
  (7th Cir. Dec. 30, 2021) ................................................12, 13, 15, 18

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ....................................................................9, 11, 12

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ....................................................................9, 11, 12

*Ivy Sports Med., LLC v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014) ................................................................6

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................3, 4, 17, 19

*Marin Audubon Soc'y v. FAA*,
  121 F.4th 902 (D.C. Cir. 2024) ............................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................... *passim*

*Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ...................................................................12, 16, 18

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ...............................................................................16

*Novartis Pharms. Corp. v. Espinosa*,
    No. 21-cv-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021), *aff'd sub nom.*
    *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024) ....................6, 14, 15, 20

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024).................................................................. *passim*

*Oregon Health & Sci. Univ. v. Engels*,
    Civ. A. No. 24-2184, 2025 WL 1707630 (D.D.C. June 17, 2025)............................5

*Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*,
    43 F. Supp. 3d 28 (D.D.C. 2014) ............................................................... *passim*

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*,
    58 F.4th 696 (3d Cir. 2023) .....................................................................................14

*Sec. & Exch. Comm'n v. Chenery Corp.*,
    332 U.S. 194 (1947)..................................................................................................10

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)..................................................................................................15

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019)................................................................10, 17, 18, 19

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)....................................................................................................5

**Statutes**

42 U.S.C. § 256b...........................................................................................................1

42 U.S.C. § 256b(a)(4)(K)...........................................................................................13

42 U.S.C. §§ 256b(a)(5)(C)–(D)...............................................................................2, 5, 6

42 U.S.C. § 256b(a)(5)(D)........................................................................................2, 6, 17

42 U.S.C. § 256b(a)(7).................................................................................................3

42 U.S.C. §§ 256b(a)(7), (d)(2)(B)(v)(II)..............................................................1, 3, 4

42 U.S.C. § 256b(a)(7)(E)............................................................................................2

42 U.S.C. § 256b(d)(2)(B) ..................................................................................................5

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

The government's opposition and cross-motion attempts to reframe this case as a narrow dispute over paperwork. It is not. This case turns on the limits Congress placed on HRSA's authority under the 340B statute and, independently, on whether HRSA complied with the Administrative Procedure Act's requirements for reasoned decision-making and lawful procedure. Congress drew clear lines in both the text and structure of 42 U.S.C. § 256b. There is no statutory gap for agency invention, and HRSA's power-expanding interpretation cannot be sustained.

Congress structured the Program around certification and "not more frequent than" annual recertification of covered entities. It authorized mid-cycle removal of a covered entity only in a single, narrowly defined circumstance: following an audit and a finding of diversion that is "*systematic and egregious as well as knowing and intentional*." 42 U.S.C. §§ 256b(a)(7), (d)(2)(B)(v)(II) (emphasis added). HRSA's asserted authority to terminate eligibility mid-cycle for alleged documentation deficiencies finds no footing in the statute. Indeed, HRSA's argument literally reads the statutory limitation on removal out of the statute.

HRSA nevertheless terminated Sagebrush's Nevada sites mid-cycle for alleged "eligibility documentation" deficiencies - without an audit, without any diversion finding, without a finding of "systematic and egregious as well as knowing and intentional conduct," and months before the next recertification window. Those actions fall outside the statutory framework and exceed the agency's authority. Accepting HRSA's contrary view would collapse the statute's annual recertification framework. HRSA's argument effectively changes the statutory standard from "not more frequent than annual" to "more frequent than annual."

Independently, HRSA's actions fail under the APA because the agency ignored material record evidence, treated similarly situated sites inconsistently, imposed a new documentation requirement without notice and failed to account for reliance interests and foreseeable downstream

consequences. Ironically, it was a federal funding interruption, not a Nevada interruption, that caused the paperwork delay that HRSA used to terminate Sagebrush. In other words, HRSA punished Sagebrush for a problem that was purely of federal origin.

The material facts are not in dispute, and the issues presented are questions of law appropriate for summary judgment. Because HRSA acted in excess of statutory authority, failed to engage in reasoned decision-making, and did not observe procedures required by law, the Court should grant Sagebrush's motion for summary judgment, deny the government's cross-motion, and remand, if at all, only for proceedings consistent with the statute and the Court's rulings.

## II.    ARGUMENT

### A.    The Statute Congress Enacted Forecloses Mid-Year Eligibility Removals Absent Procedural Safeguards and Substantive Findings.

#### 1.    Annual Certification Is the Rule; Mid-Year Removal Is the Narrow Exception.

Section 340B establishes a certification-based eligibility regime in which participation is governed by certification and not more frequent than annual recertification. 42 U.S.C. § 256b(a)(7)(E). Congress authorized removal during an active certification year only in a single, narrowly defined circumstance - after an audit and after notice and hearing, where the Secretary finds that a covered entity knowingly and intentionally engaged in especially serious misconduct - most notably diversion or duplicate discounting - and that such misconduct was systematic and egregious. *Id*. §§ 256b(a)(5)(D), (d)(2)(B)(v)(II).

The statute does not confer a general, free-standing authority to rescind eligibility mid-cycle. To the contrary, Congress paired its annual recertification requirement with a tightly cabined enforcement mechanism - audits conducted pursuant to defined procedures, followed by specified sanctions, including repayment liability and, in the exceptional case Congress identified, removal from the Program. *See id*. §§ 256b(a)(5)(C)–(D), (d)(2)(B)(v)(II). No other provision authorizes

mid-cycle termination of eligibility, retroactive declarations of ineligibility, or removal based on documentation disputes or after-the-fact disagreements about evidentiary form.

Where Congress expressly specifies the sole circumstance in which an extraordinary sanction may be imposed, courts should not infer additional, unstated grounds. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373, 400 (2024) (explaining that "a statutory ambiguity does not necessarily reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question," and that "if it is not the best [reading of a statute], it is not permissible"). HRSA's contrary reading would nullify the annual recertification requirement and deprive the mid-year diversion-removal provision of its limiting function.

Read as a coherent whole, Section 340B reflects a calibrated enforcement structure that balances program integrity with stability for safety net providers and manufacturers. Certification and annual recertification serve as the principal gatekeeping mechanisms for eligibility. *See* 42 U.S.C. § 256b(a)(7). Audits are the means by which HRSA investigates and remedies diversion or duplicate-discount violations. *See id.* §§ 256b(d)(1)(B)(i), (d)(2)(B)(i). Removal during an active certification year is reserved for the exceptional case Congress specified - where diversion is proven, through audit, to meet the statute's heightened culpability standard. *See id.* § 256b(d)(2)(B)(v)(II). Outside that narrow circumstance, a covered entity's certification remains operative until the next recertification cycle.

## 2.    HRSA's Interpretation Would Collapse the Statutory Framework.

HRSA's interpretation would unravel the statutory structure Congress enacted. If the agency was permitted to decertify sites at any time for any perceived eligibility deficiency, the command that recertification occur "on a not more frequent than annual basis" would have no operative effect, and Congress's decision to confine mid-year removal to a post-audit diversion finding would be stymied. *See* 42 U.S.C. §§ 256b(a)(7), (d)(2)(B)(v)(II). Statutory provisions must

be construed to operate together, and interpretations that drain express temporal and substantive limits of meaning are impermissible. *See Loper Bright*, 603 U.S. at 400 (a statutory ambiguity does not imply delegation to the agency, and an interpretation that is not the statute's best reading "is not permissible").

HRSA attempts to avoid this consequence by asserting that the statute creates no "one-year entitlement." That framing misses the point. Congress did not need to confer a freestanding entitlement to a fixed term of participation. Instead, it structured the Program around certification and annual recertification, and it identified a single, exceptional circumstance in which participation may be terminated between those annual checkpoints. The statutory design itself supplies the rule: absent the specified mid-year predicate, a covered entity's certification remains operative until the next recertification cycle. *See* 42 U.S.C. §§ 256b(a)(7), (d)(2)(B)(v)(II).

Accepting HRSA's contrary view would invert that design. Annual recertification would cease to be the principal mechanism for reassessing eligibility, and the carefully circumscribed mid-year removal provision would be reduced to a nullity. Courts do not adopt interpretations that effectively rewrite a statute by erasing the limits Congress deliberately imposed.

**B.    HRSA Cannot Bootstrap "Verification" Or "Inherent" Authority Into New Removal Powers.**

Unable to identify statutory text authorizing the mid-year eligibility terminations at issue, HRSA relies on two alternative theories: a generalized "verification" authority and an asserted "inherent" power to revisit prior determinations. Neither supplies authority to terminate eligibility outside the audit-based enforcement mechanisms Congress specified. And both are at odds with the express statutory requirements for removal independent of the annual recertifications.

Administrative authority to collect information, maintain databases, or verify submissions does not confer substantive power to terminate certified entities outside the enforcement

mechanisms Congress expressly prescribed. Agencies may not transform general administrative or "housekeeping" functions into authority to impose the statute's most severe sanction absent a clear delegation. *See Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.* ("*PhRMA*")*,* 43 F. Supp. 3d 28, 39–41 (D.D.C. 2014) (explaining that Section 340B confers only limited, enumerated authority on HHS and setting aside agency action taken without a statutory basis); and *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes" or confer major regulatory authority through vague or ancillary provisions).

Section 340B does direct the Secretary to develop procedures to verify covered entities and to maintain an identification system. 42 U.S.C. § 256b(d)(2)(B). But those provisions concern how HRSA administers certification and recertification; they do not expand when or on what grounds HRSA may remove a covered entity from the Program. *See PhRMA*, 43 F. Supp. 3d at 39–40 (declining to uphold agency action based on general statutory purpose where § 340B did not confer the authority HHS asserted). Verification occurs during defined registration windows and at annual recertification. By contrast, Congress placed audit authority in a separate subsection of the statute, imposed procedural safeguards, and authorized sanctions only after audit and only upon defined findings of diversion or duplicate discounting. *See* 42 U.S.C. §§ 256b(a)(5)(C)–(D); *see also Oregon Health & Sci. Univ. v. Engels*, Civ. A. No. 24-2184 2025 WL 1707630, at *5, *8 (D.D.C. June 17, 2025) (explaining that § 340B authorizes sanctions only through the statute's audit and notice-and-hearing process and treating HRSA's pre-audit measures as preliminary rather than final enforcement action). Reading "verification" to include a free-standing power to decertify sites mid-year for reasons unrelated to diversion would collapse these distinct statutory functions and override the enforcement structure that Congress enacted.

HRSA's reliance on "inherent authority" fares no better. Agencies may, in appropriate circumstances, reconsider prior decisions within the scope of their delegated authority. *See Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). But reconsideration presupposes underlying jurisdiction; it cannot be used to create powers Congress did not confer. *See id.* at 86–87 (explaining that where Congress supplies a specific statutory mechanism, an agency may not invoke inherent authority to bypass that mechanism). This case does not involve correction of clerical errors or reconsideration of discretionary judgments. It presents a threshold question of statutory authority: whether HRSA may terminate eligibility mid-year for asserted eligibility or documentation deficiencies apart from the audit-based diversion pathway Congress expressly authorized. The statute answers that question in the negative. *See* 42 U.S.C. § 256b(a)(5)(D).

Courts have repeatedly rejected efforts to expand § 340B authority beyond the limits Congress enacted. *See PhRMA*, 43 F. Supp. 3d at 39–40 (setting aside § 340B rule adopted without statutory authorization); *Novartis Pharms. Corp. v. Espinosa,* No. 21-cv-1479, 2021 WL 5161783, at *8-9 (D.D.C. Nov. 5, 2021) (vacating HRSA enforcement letters premised on atextual mandates), *aff'd sub nom. Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *see also Ivy*, 767 F.3d at 86–87 (agency may not invoke inherent authority to bypass a statutory mechanism Congress specified). Where Congress has spoken with precision about when removal is permitted, HRSA must operate within those limits - and may not supply missing authority through "verification," inherent power, or enforcement letters. *See* 42 U.S.C. §§ 256b(a)(5)(C)–(D).

## C.    The Administrative Record Confirms Statutory Eligibility And HRSA's Contemporaneous Knowledge.

Even if HRSA were to possess the mid-year removal authority it claims, which it does not, the challenged terminations cannot be sustained on this administrative record. The record shows

that HRSA was presented with evidence establishing Sagebrush's statutory eligibility, knew that Nevada regarded Sagebrush as an approved Section 318 partner, and acted while aware that formal documentation was imminent and retroactively effective.

### 1.    Undisputed Record Facts

The following facts are not genuinely disputed:

- **State confirmation of Section 318 support.** The Nevada Department of Health and Human Services confirmed that Sagebrush's Nevada sites were providing Section 318-supported services through the State during the relevant period. Mem. Op. 5, Dkt. 34 (June 27, 2025).

- **HRSA's contemporaneous knowledge.** During its review, HRSA was informed that Nevada considered Sagebrush an approved partner and that formal documentation was being finalized to memorialize the funding stream and avoid service gaps caused by delays in federal funding awards to the State. *Id.* at 0012490, 0012288.

- **Imminent, retroactive memorialization.** Nevada issued a memorandum confirming that updated subaward documentation would issue with retroactive effect, expressly to prevent interruption of public health services. *Id.* at 0012288–89.

- **No audit and no diversion finding.** HRSA conducted no audit and made no finding - let alone the statutorily required finding - that Sagebrush engaged in diversion that was systematic, egregious, as well as knowing and intentional. D's Br. (ECF No. 46) at 10 (admitting that Sagebrush was not terminated for diversion or duplicate discounting).

- **Inconsistent treatment of similarly situated sites.** HRSA left at least one Nevada site (STD891132) active while terminating other Nevada sites supported by the same State funding stream, without explanation. *Id.* at 0012279–80, 0012318.

### 2. The Record Establishes Eligibility and HRSA's Knowledge.

The administrative record confirms that Sagebrush's Nevada sites received Section 318 support through the Nevada Department of Health and Human Services during the relevant period. From the outset of HRSA's February 2024 inquiry, Sagebrush submitted notice-of-award materials, subaward packets, and contemporaneous communications from Nevada documenting the delivery of Section 318-supported services at the Nevada locations.

The record further shows that HRSA understood that Nevada regarded Sagebrush as an approved partner and that the State was in the process of formalizing site-specific documentation to ensure continuity of care. Consistent with that understanding, HRSA paused termination requests, continued its review through late 2024 and into January 2025, and was advised that Nevada was awaiting the federal Notice of Award and would promptly issue documentation with retroactive effect. Nevada then did so, issuing a subaward with a retroactive effective date and subsequently provided a fully executed packet confirming the funding structure and the State's intent to prevent service gaps.

### 3. HRSA Did Not Reconcile Its Decision with the Record.

HRSA's January termination notices did not address this record. Instead, HRSA asserted that Sagebrush "did not demonstrate" receipt of Section 318 funding and that HRSA "confirmed" the sites were not funded, without reconciling those assertions with Nevada's contemporaneous confirmations, HRSA's acknowledged awareness that updated documentation was forthcoming,

or the retroactive memorialization Nevada implemented to avoid disruption of public health services.

Nor did HRSA explain why it treated one Nevada site supported by the same State funding stream as eligible while terminating others, or why it elevated documentation format over undisputed evidence of substantive eligibility and continuity of State-supported services. The terminations thus rest on an incomplete account of the record and leave central inconsistencies unexplained.

### D.  HRSA's Decision-Making Was Arbitrary And Capricious.

The Administrative Procedure Act requires agencies to engage in reasoned decision-making. Agency action is arbitrary and capricious where the agency fails to consider important aspects of the problem, ignores evidence that cuts against its conclusion, or offers an explanation that cannot be reconciled with the record. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (agency action is arbitrary if it "entirely failed to consider an important aspect of the problem" or "offered an explanation … that runs counter to the evidence before the agency").

When an agency changes course, it must acknowledge the change and provide good reasons, including accounting for facts or reliance interests underlying the prior approach. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515–16 (2009) (agency must "display awareness that it *is* changing position" and provide reasons for the new policy); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222–24 (2016) (declining to give force of law to agency action adopted without a reasoned explanation or consideration of reliance interests).

The APA likewise forbids unexplained disparate treatment of similarly situated parties. Where an agency applies different standards to materially indistinguishable entities and fails to justify the distinction, its action cannot stand. *See Burlington N. & Santa Fe Ry. Co. v. Surface*

*Transp. Bd.,* 403 F.3d 771, 777 (D.C. Cir. 2005) (agency action is arbitrary and capricious when it treats similarly situated parties differently without a reasoned explanation and substantial evidence). HRSA's actions here exhibit each of these defects.

### 1.    HRSA Ignored the Full Record and Obvious Alternatives.

HRSA treated a mid-January snapshot as dispositive while disregarding record evidence it had already received and information it knew was forthcoming. As set out in Section III, HRSA was aware that Nevada regarded Sagebrush as an approved Section 318 partner, that formal documentation was being finalized to memorialize the funding stream, and that such documentation would be retroactively effective to prevent service gaps. An agency may not treat the record as closed at a moment it knows to be incomplete and then disregard evidence that cuts directly against its conclusion. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary if it "entirely failed to consider an important aspect of the problem" or "offered an explanation … that runs counter to the evidence before the agency"); *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (courts may not uphold agency action on grounds the agency itself did not invoke).

Relatedly, HRSA failed to consider obvious and less drastic alternatives to immediate, mid-year termination. At a minimum, HRSA could have awaited the imminent, retroactive documentation it knew was forthcoming, sought clarification from the State, or addressed any remaining questions at the next annual recertification. The APA requires agencies to consider such alternatives, particularly where the chosen course carries severe and disruptive consequences. *See State Farm*, 463 U.S. at 51–52 (faulting agency for failing to consider reasonable alternatives); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (vacating agency action where the agency failed to reconcile its choice with obvious alternatives and its own prior findings).

### 2.    HRSA Treated Similarly Situated Sites Inconsistently.

HRSA treated similarly-situated Nevada sites differently without explanation. It left one site (STD891132) active while terminating other sites supported by the same State funding stream, without articulating any principled basis for the distinction. Unexplained disparate treatment of materially indistinguishable entities is a textbook example of arbitrary and capricious decision-making. *See Burlington*, 403 F.3d at 776–77 (agency action is arbitrary and capricious where it "applies different standards to similarly situated entities" without a "reasoned explanation" supported by the record).

An agency must explain the distinctions it draws; silence is not sufficient. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary if it "entirely failed to consider an important aspect of the problem" or offered an explanation that "runs counter to the evidence before the agency").

### 3.    HRSA Departed from the Statutory Enforcement Framework Without Explanation.

HRSA further short-circuited Congress's audit-centered enforcement scheme. HRSA conducted no audit, issued no final audit findings, and made no diversion determination, yet nonetheless effectuated removal through database changes and public postings and pressed for "self-termination." That approach departed from the statutory process and from HRSA's prior enforcement posture without acknowledgment or justification. When an agency changes course, it must display awareness that it is changing position, provide good reasons for the new policy, and account for any reliance interests engendered by the prior approach. *See Fox*, 556 U.S. at 515–16 (agency must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy"); *Encino*, 579 U.S. at 222–24 (unexplained inconsistency and failure to account for reliance interests render agency action arbitrary and capricious and unable to carry the force of law).

Courts have set aside HRSA actions where the agency abruptly asserted enforcement authority under § 340B without grappling with statutory limits or its own prior position. *See Eli Lilly & Co. v. U.S. Dep't of Health & Hum. Servs.,* No. 21-cv-00081, 2021 WL 5039566, at *22–24 (S.D. Ind. Oct. 29, 2021) (vacating HRSA enforcement action where the agency adopted a binding position without acknowledging or explaining a change from prior practice and without adequate reasoning), *appeal filed sub nom. Eli Lilly & Co. v. Becerra,* No. 21-3128 (7th Cir. Nov. 15, 2021) *and appeal filed sub nom. Eli Lilly & Co. v. Health & Hum. Servs.,* No. 21-3405 (7th Cir. Dec. 30, 2021).

Agencies are also bound by their own procedures and may not bypass them without explanation. *See Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA,* 752 F.3d 999, 1009–10 (D.C. Cir. 2014) (agency action unlawful where the agency failed to follow its own regulatory framework and offered no reasoned explanation for departure).

### 4.    HRSA Failed to Account for Reliance Interests and Foreseeable Consequences.

Finally, HRSA failed to account for reliance interests and the foreseeable real-world consequences of its actions. The terminations and associated public postings predictably triggered manufacturer conduct, chargeback denials, and disruption to safety-net care. Where agency action foreseeably alters the conduct of regulated parties and third parties, the APA requires the agency to take those effects into account and to explain its decision in light of them. *See Fox,* 556 U.S. at 515–16 (when changing position, an agency must "display awareness that it is changing position" and provide "good reasons," including consideration of reliance interests); *Encino,* 579 U.S. at 222–24 (unexplained inconsistency and failure to account for reliance interests render agency action arbitrary and capricious and unable to carry the force of law).

The APA also requires agencies to consider important aspects of the problem, including downstream consequences that are apparent from the record. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary if it "entirely failed to consider an important aspect of the problem" or offered an explanation that "runs counter to the evidence before the agency"). HRSA did neither here.

### E.    HRSA Imposed A New Binding Documentation Requirement Without Notice And Comment.

HRSA characterizes its insistence on site-specific documentation listing grant numbers, funding amounts, and site addresses as a routine application of existing verification requirements. The administrative record shows otherwise. What HRSA treated as "eligibility documentation deficiencies" was, in substance, a requirement that covered entities possess and produce documentation in a particular format not required by the statute or by prior guidance, and one that carried immediate legal consequences. Imposing such a requirement without notice-and-comment rulemaking violated the Administrative Procedure Act. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 459–63 (D.C. Cir. 2024) (rejecting HRSA's attempt to impose obligations untethered from the text of Section 340B and holding that statutory silence does not authorize the agency to create binding requirements); *PhRMA*, 43 F. Supp. 3d at 39–40 (explaining that Section 340B confers only limited, enumerated authority on HHS and setting aside a rule adopted without statutory authorization); *Eli Lilly*, 2021 WL 5039566, at *22–24 (vacating HRSA action where the agency adopted a binding enforcement position without notice-and-comment procedures or a reasoned explanation).

The statute defines eligibility in functional terms. Covered entities qualify by "receiving funds" through a State or unit of local government for Section 318 purposes. 42 U.S.C. § 256b(a)(4)(K). The statute does not prescribe a particular documentary format for proving receipt

of those funds, require executed site-named subaward agreements listing addresses and dollar allocations, or mandate that such documentation exist - and be producible - at all times during an active certification year. Nor does it condition continued participation on possession of documentation in a specific form rather than on the substantive fact of State-supported service delivery. *See Johnson*, 102 F.4th at 459–63 (courts may not infer extra-statutory conditions from silence); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs*., 58 F.4th 696, 707 (3d Cir. 2023) ("[l]egal duties do not spring from silence").

HRSA nonetheless demanded precisely that. During its review, the agency required executed site-by-site documentation tying each registered location to a specific funding instrument at a particular moment in time. It discounted contemporaneous State confirmations explaining the funding structure and proceeded to terminate sites and issue repayment directives when the demanded format was not produced, all despite knowing that formal documentation was imminently forthcoming and would be retroactively effective. In practice, failure to satisfy HRSA's preferred documentation format was treated as dispositive of eligibility.

That approach imposed a new substantive condition of participation, not a neutral evidentiary preference. By making documentation format outcome-determinative and attaching immediate legal consequences to noncompliance, HRSA adopted a binding norm of general applicability. Agencies may not impose such rules through ad hoc enforcement or case-specific adjudication; they must do so, if at all, through notice-and-comment rulemaking. *See PhRMA*, 43 F. Supp. 3d at 39–40, 46 (binding rules require notice and comment where Congress has not delegated broader authority); *Espinosa*, 2021 WL 5161783, at *8–9 (setting aside HRSA enforcement letters premised on atextual, categorical mandates).

14

HRSA's documentation demand also operated retroactively. The agency applied a newly articulated format requirement to a previously-certified entity mid-cycle and used the absence of that format - one not required by statute or prior guidance - to declare sites ineligible and to trigger repayment consequences. The APA does not permit agencies to impose new substantive obligations retroactively or to penalize regulated parties for failing to anticipate requirements the agency had never lawfully adopted. *See Eli Lilly*, 2021 WL 5039566, at *22–24; *Johnson*, 102 F.4th at 459–63.

HRSA's documentation requirement was procedurally invalid because it functioned as a binding rule, carried immediate legal consequences, and was adopted without notice and comment. The defect provides an independent basis to set aside the termination and related directives that is in addition to HRSA's lack of statutory removal authority and its arbitrary decision-making. *See PhRMA*, 43 F. Supp. 3d at 46–47; *Espinosa*, 2021 WL 5161783, at *8–9; *Eli Lilly*, 2021 WL 5039566, at *24, *26.

Finally, HRSA's shifting interpretive positions under Section 340B are entitled, at most, to *Skidmore* deference and cannot overcome the statute's silence on documentation format or timing. *See Skidmore v. Swift & Co*., 323 U.S. 134 (1944) (agency's interpretation receives only the degree of respect warranted by the agency's power to persuade - based on the agency's thoroughness, validity of reasoning, consistency, and expertise - rather than binding deference); *Johnson*, 102 F.4th at 459–63 (agency interpretation must be persuasive to receive *Skidmore* weight).

### F.    HRSA's Repayment Directives Are Final Agency Action And Unlawful.

HRSA's repayment directives constitute final agency action subject to review under the Administrative Procedure Act. Agency action is final where it marks the consummation of the agency's decision-making process and determines rights or obligations or produces legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

Both elements are satisfied here. HRSA declared Sagebrush's Nevada sites ineligible for the relevant period, reflected that determination in public-facing systems, directed Sagebrush to calculate the scope of noncompliance and repay manufacturers, and conditioned re-registration on repayment and proof of compliance. Those steps reflect a definitive agency position, not a tentative or interlocutory one. *See Nat'l Mining Ass'n v. McCarthy,* 758 F.3d 243, 251–52 (D.C. Cir. 2014) (finality satisfied where agency action reflects a settled position with immediate compliance consequences); *Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1021–23 (D.C. Cir. 2000) (guidance deemed final where it had binding practical effect).

The repayment directives also carried immediate legal and practical consequences. Manufacturers relied on HRSA's determinations to deny chargebacks and press repayment demands, and Sagebrush faced concrete financial exposure and barriers to re-registration as a result. Such "direct and appreciable legal consequences" satisfy *Bennett*'s second prong. *See Bennett*, 520 U.S. at 178; *Appalachian Power*, 208 F.3d at 1022. Finality does not depend on whether the agency might later revisit its position. *See Clean Air Project,* 752 F.3d at 1006–07 (agency action may be final even if subject to future revision).

HRSA cannot avoid review by characterizing the directives as advisory. An agency's labels do not control; what matters is whether the action reflects a settled position with binding consequences for regulated parties and third-party decision-makers. *See Appalachian Power*, 208 F.3d at 1021–23; *McCarthy*, 758 F.3d at 250–51. Here, HRSA's directives compelled Sagebrush to act and predictably reshaped the conduct of manufacturers. They therefore constitute final agency action.

The repayment directives are also unlawful. As explained above, HRSA lacked statutory authority to terminate the Nevada sites mid-year, acted arbitrarily and capriciously in doing so,

and imposed a binding documentation requirement without notice and a hearing. *See PhRMA*, 43 F. Supp. 3d at 39–41 (recognizing the limits of HRSA's § 340B enforcement authority); *State Farm*, 463 U.S. at 43–44 (agency action unlawful where it lacks reasoned decision-making). The repayment directives flowed directly from those unlawful determinations and rest on the same defective premises. *See Loper Bright*, 603 U.S. at 381–83 (courts must independently decide questions of law and set aside agency action lacking statutory authorization).

Moreover, because HRSA conducted no audit and made no diversion finding - much less a finding that diversion was systematic, egregious, and knowing and intentional - the statute provides no basis for ordering or compelling repayment. Section 340B authorizes findings of violation and related remedies only "after audit … and after notice and hearing." 42 U.S.C. § 256b(a)(5)(D).

Accordingly, the repayment directives cannot stand independently of the unlawful eligibility determinations on which they are premised.

### G.    The Proper Remedy Is Vacatur, Reinstatement, and Injunctive Relief.

Vacatur is the ordinary remedy under the Administrative Procedure Act. Section 706(2) directs courts to "hold unlawful and set aside" agency action that is not in accordance with law - a command, not a discretionary option. *See Loper Bright*, 603 U.S. at 391 (courts must independently decide questions of law under Section 706 and set aside agency action lacking statutory authorization). The D.C. Circuit has likewise emphasized that vacatur is the normal course, and that remand without vacatur is reserved for unusual cases. *See United Steel*, 925 F.3d at 1287.

That relief is warranted here. HRSA's actions suffer from multiple, independent legal defects: lack of statutory authority, arbitrary and capricious decision-making, and adoption of a binding documentation requirement without notice and comment. Each defect independently

requires setting the agency's actions aside. *See PhRMA*, 43 F. Supp. 3d 46–47 (vacating Section 340B rule for lack of authority); *Eli Lilly*, 2021 WL 5039566, at *22–26 (vacating HRSA action as arbitrary and capricious).

Applying the familiar *Allied-Signal* framework confirms that vacatur is appropriate. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). The deficiencies here are serious, not technical. HRSA terminated certified sites mid-year without statutory authorization, bypassed Congress's audit-based enforcement scheme, ignored material record evidence and obvious alternatives, treated similarly situated sites inconsistently, and imposed a new, outcome-determinative documentation requirement without notice and comment. These errors go to the heart of the agency's authority and the lawfulness of its actions and are not remediable by post hoc explanation on remand. *See United Steel*, 925 F.3d at 1287 (vacatur warranted where agency could not explain how rule could be saved); *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 918 (D.C. Cir. 2024) (vacating where agency would need to "take a completely different tack" on remand).

Vacatur would not be disruptive. Setting aside the January 2025 site removals and related repayment directives would simply restore the status quo ante - the certification status that existed before HRSA's unlawful actions - and halt their continuing effects. *See United Steel*, 925 F.3d at 1287 (vacatur "automatically resurrects" the prior regime); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001) (prevailing APA claimant is entitled to relief without showing irreparable injury). Vacatur would prevent ongoing harm to safety-net providers and patients, eliminate confusion caused by erroneous public postings, and stop manufacturer conduct triggered by HRSA's unlawful determinations. *See Clean Air Project*, 752 F.3d at 1000–11 (vacatur appropriate to remove binding directive and restore lawful baseline). Where, as here, the

defects cut to statutory authority and required process, there is no serious prospect that the agency could lawfully reach the same result on remand.

Reinstatement follows as a necessary corollary to vacatur. Because the statute centers eligibility on certification and annual recertification and permits mid-year removal only in the narrow circumstance Congress specified, vacating the unlawful removals requires reinstating the Nevada sites through their applicable certification periods so that relief is not illusory. *See United Steel*, 925 F.3d at 1287; *Am. Bioscience*, 269 F.3d at 1083–84.

Injunctive relief is also appropriate. HRSA's actions have already produced concrete and ongoing harms - repayment demands, chargeback denials, and disruption to the delivery of safety-net care - and there is a meaningful risk of recurrence absent prospective relief. Courts routinely issue injunctions to prevent agencies from accomplishing indirectly what they lack authority to do directly, particularly where procedural and substantive APA violations have occurred and continuing effects remain. *See Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 405–10 (S.D. Ind. 2021) (granting injunctive relief to prevent enforcement of a procedurally invalid § 340B rule and to halt ongoing unlawful effects). An injunction barring enforcement of repayment directives and prohibiting reliance on the vacated removals - including conditioning re-registration on repayment premised on those removals - is necessary to ensure effective relief.

Any remand should be strictly limited. The Court should not invite post hoc rationalizations, retroactive rulemaking, or a reinvention of authority Congress withheld. *See State Farm*, 463 U.S. at 43 (courts may not supply post hoc rationales); *Loper Bright*, 603 U.S. at 381–83. If further proceedings are required, they must be consistent with the statute and the Court's rulings and confined to lawful mechanisms - annual recertification or audit-based enforcement where statutory predicates are satisfied - rather than gap-filling through guidance lacking the force

of law. *See Johnson*, 102 F.4th at 459–63; *Espinosa*, 2021 WL 5161783, at *9; *PhRMA*, 43 F. Supp. 3d at 46–47.

For these reasons, the Court should vacate HRSA's January 2025 removals and repayment directives, order reinstatement of the Nevada sites through the full term of their certification periods, require correction or removal of contrary public postings, enjoin enforcement of repayment demands premised on the vacated actions, and remand, if at all, for the sole purpose of proceedings required by law.

## III.    CONCLUSION

The 340B statute draws clear and deliberate limits on HRSA's authority. Congress anchored eligibility in annual certification and recertification and authorized mid-year removal only in a single, narrowly defined circumstance - following an audit and a finding of diversion that is systematic, egregious, and knowing and intentional. HRSA disregarded that structure. It terminated Sagebrush's Nevada sites mid-year without statutory authorization (ironically based on a federal funding delay), ignored material record evidence and obvious alternatives, treated similarly situated sites differently without explanation, and imposed a new, binding documentation requirement without notice and comment. It then compounded those errors by issuing repayment directives premised on the same unlawful determinations.

The Administrative Procedure Act does not permit those actions to stand. The administrative record is complete, the material facts are not in dispute, and the issues presented are questions of law suitable for resolution on summary judgment. Because HRSA acted in excess of statutory authority, failed to engage in reasoned decision-making, and did not observe procedures required by law, its actions must be set aside.

For these reasons, the Court should grant Sagebrush's motion for summary judgment, deny the government's cross-motion, vacate HRSA's January 2025 removals and repayment directives,

order reinstatement of the Nevada sites through their applicable certification periods, require correction or removal of contrary public postings, enjoin enforcement of repayment demands premised on the vacated actions, and remand, if at all, only for proceedings consistent with the statute and the Court's rulings.

Dated: January 7, 2026

Respectfully submitted,

**ARENTFOX SCHIFF LLP**

By: *<u>/s/ James H. Hulme</u>*
James H. Hulme (Bar No. 323014)
Douglas A. Grimm (Bar No. 495805)
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006-5344
Ph: 202.857.6000
Fax: 202.857.6395
james.hulme@afslaw.com
douglas.grimm@afslaw.com

*Counsel for Plaintiff Sagebrush Health Services*

OF COUNSEL:

Eric Roman
ArentFox Schiff LLP
1301 Avenue of the Americas, Floor 42
New York, NY 10019-6040